GEORGE GRUMMETT ET AL. v. VICTORIA GINGRASS ET AL.

*Equity jurisdiction—Forfeiture—Agreement to give mining lease—Specific performance.*

1. This suit, if all that complainants seek should be admitted, is neither more nor less than in a court of equity to enforce a forfeiture, and to do it in favor of a party out of possession against one in possession. Such a case has never hitherto been heard of, and is not within the jurisdiction of equity. The parties in possession have all the rights that the holders of the legal title could give them, and a plainer case of an attempt to enforce a forfeiture could not be presented, and it involves the still greater anomaly of such an attempt by a person who has no title at all.

2. Even if the complainants had acquired the right, which it is difficult to see how they could acquire, to enforce a forfeiture, if a cause of forfeiture existed, this is not a proceeding in which it can be done. There are different objections to it. In the first place, the only method of forfeiture mentioned in the lease is a re-entry, and at law there could be no completed

77 MICH.—24.

forfeiture without it. An agreement to give a lease in future is certainly no transfer of title, and could not authorize complainants to enter for that or any other purpose. Until they get their lease, if they have any interest in the land itself, which is, at least, doubtful, it is only such an interest as could be recognized in a court of equity.

3. Act No. 73, Laws of 1883, allowing specific performance of agreements to give revocable leases, does not undertake to otherwise enlarge the jurisdiction, and was adopted to remove the difficulty exemplified in *Rust v. Conrad*, 47 Mich. 449, in which it was held that equity would not enforce the execution of a lease which could at any time be terminated at the will of a party. But said act does not authorize the compulsory performance of an agreement with no valuable consideration, and with nothing done under it to put the complainants in the condition of losing the equivalent of solid values; but it is based on the idea that complainants have had some valuable thing to do and have done it so as to earn the performance.

4. A forfeiture is a strict legal right and can never be enforced except by the holder of the legal title.

Appeal from Marquette. (Grant, J.) Argued January 22, 1889. Decided November 8, 1889.

Bill to enforce specific performance of an agreement to execute a mining lease. Complainants appeal from decree dismissing bill. Affirmed. The facts are stated in the opinion.

*Hill & Towne (Marston, Cowles & Jerome,* of counsel), for complainants.

*E. E. Osborn,* for defendants Gingrass.

*W. P. Healy* and *F. O. Clark,* for defendant Foley.

*Hayden & Young (James H. Hoyt,* of counsel), for defendants White, Mather, and The Michigan Gold Company.

CAMPBELL, J. This suit was brought below to obtain specific performance of a contract for a lease of mining

lands in Marquette county. The court below dismissed the bill on the merits. The witnesses were examined in open court. In some things they were in conflict. In some there was no contradiction of facts.

The agreement in question was made in December, 1886. The land was owned by Victoria Gingrass, who is not able to read and write. The facts claimed on one side and the other are as follows: In 1885 Mrs. Gingrass made a mining lease to Miner and Jones of two detached parcels of 40 acres each,—one on section 35, township 48 north, of range 28 west, and the other on section 36, in township 48 north, of range 28 west. This lease was assigned by the lessees to Peter White for an actual consideration of $10,000, and this assignment was known to all parties. Mr. White paid taxes on the property, and did some exploring. In the early part of 1886 it was agreed that the lot on section 36 might be relinquished to Mrs. Gingrass if she desired it, the lessees retaining the parcel in section 35. By the terms of this lease, after August, 1886, the lessees were not bound to do any work, by exploring or otherwise, and were to pay at the end of each year a sum of $5,000 in case the lease was not terminated by themselves by notice. The uncontradicted testimony shows that Gingrass, before and up to August, 1886, purposely abstained from endeavoring to terminate the lease in order that this money rent might be secured. It is not set up in the bill that either he or Mrs. Gingrass had ever asserted any forfeiture of the lease, but the only reliance is that in December, 1886, they claimed it was abandoned. This, however, is not shown. The lease could not be abandoned by the lessees by mere inaction, although that, prior to August, 1886, might have been relied on had it existed, and had the lessors insisted upon it as they, according to undisputed testimony, did not. After August, 1886, they became entitled to receive, and

the lessees became bound to pay, the money rent, and the lease could only be terminated by notice, which no one claims was ever given.

In December, 1886, Grummett obtained a lease of the parcel in 36, with the usual mining clauses. There is a direct conflict of testimony as to how far the same transaction contemplated anything concerning 35. On this, Mr. and Mrs. Gingrass and another witness directly contradict Grummett. All agree that he knew of the Miner and Jones lease. He himself represents that he did not give Mr. and Mrs. Gingrass to understand he wanted 35 for mining purposes, but wished it for a stamp-mill. It was not claimed that any present interest could be or would be given in the land. An agreement was made for a lease after June 1, 1887, on the same terms as the one of 36. This agreement contains nothing to be done by Grummett, and the only agreements are by Mr. and Mrs. Gingrass, although signed by Grummett. The consideration was nominal. The agreement was not to have any effect till the next June, and no right of possession was given. Until that time arrived Grummett could do nothing to increase his rights or equities; and at that time he was not in possession, and had no right to be. When he subsequently undertook to put explorers or workmen on the land, Mr. White had men there at work, and Mr. Gingrass had already refused to give Grummett a lease. Gold had been discovered on adjoining property, and this discovery was evidently the occasion of Grummett's desire to get the lease.

It is not very important to consider how far this agreement could be enforced had no one been interested but Mrs. Gingrass. The statute of 1883, allowing specific performance of agreements to give revocable leases, does not undertake to otherwise enlarge the jurisdiction, and was adopted to remove the difficulty exemplified in *Rust v.*

*Conrad,* 47 Mich. 449 (11 N. W. Rep. 265), which led to it. It was held in that case that equity would not enforce the execution of a lease which could at any time be terminated at the will of a party. But the statute does not authorize the compulsory performance of an agreement with no valuable consideration, and with nothing done under it to put the complainants in the condition of losing the equivalent of solid values. It is based on the idea that complainants have had some valuable thing to do and have done it so as to earn the performance. This contract called for nothing, and nothing was done or to be done. And the testimony is not satisfactory that Mrs. Gingrass understood what she was signing as involving a positive agreement to lease. No one heard the paper read to her, and Gingrass is the only one who knows what she understood it to be. Her own testimony is quite clear that she did not fully comprehend it.

But, leaving her out of the question, there is no pretense that Grummett did not know that this lease was in existence and owned by White. He knew, also, that section 36 had been expressly released from it. He does not claim that he understood any proceedings had ever been had to forfeit or re-enter. He was not, by the agreement, authorized to go into possession himself. His agreement conveyed no present interest, and was not entitled to record, and could not override any action taken in ignorance of it; and before he asserted rights under it other rights had become fixed. The testimony is positive that he knew of the dealings of White in transfering his rights to the other defendants, and he made no objection. He did not take the stand to meet the testimony on this head, and his subsequent proceedings look very much like an after-thought. But the fact remains, in any event, that, before the agreement of December,

1886, the rights of the lessees had become fixed, so that they had until August, 1887, to pay their rent, and the lessors could not thereafter cut them off. There was no power after August, 1886, to forfeit the lease for any previous ground not acted on, and, as already stated, the bill does not aver that in December, 1886, any forfeiture had been enforced, or sought to be.

Even if the complainants had acquired the right, which it is difficult to see how they could acquire, to enforce a forfeiture, if a cause of forfeiture existed, this is not a proceeding in which it can be done. There are different objections to it. In the first place, the only method of forfeiture mentioned in the lease is a re-entry, and at law there could be no completed forfeiture without it. An agreement to give a lease in future is certainly no transfer of title, and could not authorize complainants to enter for that or any other purpose. Until they get their lease, if they have any interest in the land itself, which is, at least, doubtful, it is only such an interest as could be recognized in a court of equity.

This suit, if all that complainants seek should be admitted, is neither more nor less than in a court of equity to enfore a forfeiture, and to do it in favor of a party out of possession against one in possession. Such a case has never hitherto been heard of, and is not within the jurisdiction of equity. The parties in possession have all the rights that the holders of the legal title could give them, and a plainer case of an attempt to enforce a forfeiture could not be presented. It involves the still greater anomaly of an attempt to enforce a forfeiture by a person who has no title at all. A forfeiture is a strict legal right, and can never be enforced except by the holder of the legal title.

If complainants have rights under the contract against

Mrs. Gingrass, they have a legal remedy. But they have no standing in equity.

As all parties on either side derive title through White or Grummett, it is not necessary to refer to the *minutiæ* of the conveyances of their interests, except to point out that White's title stood clear upon the record, and was transferred to parties who paid value without knowledge of anything to defeat it, and who had, the acquiescence of the owner of the fee and the silence of Grummett to justify their purchase. They are *bona fide* purchasers for value. But complainants made out no case against their grantor.

The decree below was correct, and should be affirmed.

SHERWOOD, C. J., and CHAMPLIN, J., concurred with CAMPBELL, J.

MORSE, J., *(dissenting)*. The complainants ask for the specific performance of a written contract, dated December 16, 1886, whereby Peter Gingrass and Victoria, his wife, agreed to lease to George Grummett, for a period of 30 years, 40 acres of land for mining purposes. Said contract is as follows:

"For and in consideration of the sum of one dollar, and other valuable considerations, we hereby agree to lease to George Grummett, for a period of thirty years from and after the first day of June, 1887, the following described lands, viz.: The north-west quarter of the north-east quarter (N. W. ¼ of N. E. ¼) of section thirty-five (35), township forth-eight (48) north, range twenty-eight (28) west, in Marquette Co., Mich. Said lease, when given, will be for mining gold and silver, and the ores thereof, and shall conform and agree in all its conditions to the lease we have already given to said George Grummett on the north-east quarter of the north-west quarter (N. E. ¼ of N. W. ¼) of section thirty-six (36), township forty-eight (48) north, range twenty-eight (28) west, in Marquette Co., Mich., and dated June 1, 1887.

"In witness whereof we have hereunto subscribed our

names and affixed our seals this sixteenth day of December, A. D. 1886.

" PETER E. GINGRASS.'          [Seal.]

" VICTORIA  X  GINGRASS.     [Seal.]
      her mark.

" GEORGE GRUMMETT.          [Seal.]

" Signed and sealed in presence of

    " WILLIAM GARDNER.

    " M. LOUISA GINGRASS."

The other complainants acquire their rights under an assignment of this agreement.

The complainants allege in their bill, in substance, than prior to December 1, 1886, the defendant Victoria Gingrass was the owner of this 40 acres of land, and also of the north-east quarter of the north-west quarter of section 36, same town and range, situated in the county of Marquette, and is still the owner of the same. The first description, the 40 in question, is spoken of in the record as the " west 40," and the last description as the " east 40." That Peter E. Gingrass is and was the husband of the said Victoria, and has had the charge of said lands for her, and has, at different times, carried on negotiations with parties touching the giving of mining options and mining leases of said lands, with the knowledge and approval of his said wife.

That in December, 1886, and prior thereto, George Grummett had several interviews with the said Peter E. Gingrass with the view of securing a mining lease of said premises. Gingrass offered to give a mining lease of the " east 40," but Grummett declined to lease it unless he could also lease the " west 40." That the object of Grummett, which was well known by the said Peter E. and Victoria Gingrass, was to secure leases of these lands for the purpose of exploring, for mining, taking out, and removing therefrom such gold and silver ores, minerals,

or quartz as might be found therein, and, upon taking a mining option or lease, it was known by them that the said Grummett would have to expend large sums of money in exploring for such minerals; that during these negotiations Peter E. Gingrass informed Grummett that a mining option to explore for iron upon said "west 40" had been given to some one, which would expire in June, 1887; that said Gingrass did not wish to give Grummett a lease of said 40 until such option expired, but he would give him a written agreement, contracting thereby to give him a lease upon June 1, 1887, such lease to conform in all respects to, and be like the lease of, the "east 40" to be given said Grummett.

That thereupon a lease of the "east 40" was prepared, and, although they bear different dates, the agreement being dated December 16, 1886, and the lease December 20, 1886, both were drawn at the same time, and constituted but one transaction, and were delivered at the same time; that after such execution and delivery of these instruments the said Grummett proceeded to explore for minerals according to the terms of said lease, and expended large sums of money in such exploration, and kept and performed his agreements in every respect; that afterwards, with the full knowledge and consent of Gingrass and his wife, Grummett entered into the possession of the said "west 40" in May, 1887, and commenced explorations thereon, and during said month, and since then, expended large sums of money in such explorations, all of which was well known to said Peter E. and Victoria Gingrass; that on June 1, 1887, the said Grummett applied to said Peter E. and Victoria Gingrass for a lease according to the terms of said agreement, and was thereupon requested by them to continue his explorations on said "west 40," and they would have a lease prepared and deliver the same to him.

That he afterwards applied for said lease from time to time, but, on various pretenses, the same was not executed or delivered, and finally Grummett had a lease drafted conforming to the terms of the contract, and presented the same to the said Peter E. and Victoria Gingrass for execution, and they refused to execute it.

Foley is made a defendant because he claims to hold a mining option antedating this agreement. Miner and Jones are parties to a mining lease of the "west 40," executed in 1885, which they assigned to Peter White. White assigned an interest in the same to the defendant Mather.

The bill prays a decree that Victoria Gingrass execute and deliver to the complainants a lease of the said "west 40," according to the terms of said agreement, and that the other defendants have no rights or privileges in said land as against the complainants.

The lease of the "east 40" is set out in an exhibit attached to and made a part of the bill. It is in the usual form of mining leases in the Upper Peninsula, and is duly executed and acknowledged, and was recorded in the resister of deeds' office of Marquette county on December 28, 1886. The agreement relied upon was also duly acknowledged on December 16, 1886, and recorded in the same office as the lease, on the same day and year as the lease. Victoria Gingrass, in her answer, admits that she was and is the owner in fee-simple of these lands, but says that on August 14, 1885, she and her husband executed and delivered a mining lease of the "west 40," with other lands, to the defendants Jones and Miner for 21 years, and that the same is now in full force and effect. She avers that at the time the agreement was given to Grummett he was informed of this mining lease, and knew it was in force, and he took the agreement with the understanding that he was not to have a lease of said

"west 40" until the Jones and Miner lease was surrendered or canceled; that the agreement as to the "west 40," had nothing whatever to do with the leasing of the "east 40," each transaction being independent of the other.

She claims that Grummett has not fulfilled the conditions of the lease, and has forfeited the same; that Grummett went upon the "west 40," and worked there without her permission or consent, worked there a few days, and then went away, removing his tools, and saying to defendant that—

"He did not wish anything further to do with said land; that it was of no value; and that he did not care for a lease thereon under any circumstances."

The defendant Joseph C. Foley answers, claiming the right to a lease of this land for gold and silver mining purposes, under an agreement in writing between himself and Peter E. Gingrass, dated September 12, 1884, at which time he avers the said Peter owned the premises. By the terms of this agreement, which, he alleges, he has fulfilled on his part, he was to have a lease for 20 years, beginning September 1, 1885.

Peter E. Gingrass answers, disclaiming any interest in the premises.

The defendant Anson B. Miner answers that the lease given to Jones and himself, August 14, 1885, is still in force; denies that Grummett has or ever had any interest in the premises; sets out the assignment of Jones and himself to Peter White, August 19, 1885, of all their interest in said mining lease to them, and says that thereby he parted with all his interest in the lease or lands, which the said Grummett well knew; and prays to be dismissed, with costs.

The defendants William G. Mather and Peter White answer at length, denying the claim of Grummett and his

associate complainants, and setting forth their rights in the premises; that the lease executed by Peter E. Gingrass and wife to Miner and Jones was duly recorded in the proper office on August 14, 1885, by which record constructive notice of its existence was given to all persons; that the assignment of said lease to said White was also duly recorded on August 19, 1885. White further avers that he knew nothing of Grummett's explorations upon said land, or that he had entered thereon, or of his claim to the premises, as alleged in his bill of complaint, at the time he acquired the assignment of the Miner and Jones lease, nor till long afterwards, and after he (White) assigned a certain interest in said land to the defendant Mather. White avers further that on August 1, 1887, he subleased this land to Mather; that White has been in continuous possession of this land since the assignment of this lease to him, until he delivered possession to Mather under this sublease; that, while in such possession, he was required to and did pay to Victoria Gingrass, under the terms of said lease, $5,000 for the rent of the whole premises; and that he has otherwise kept and performed his said lease in all things.

Mather says in this answer that before the commencement of this suit he assigned and transferred all his interest in said lease to the Michigan Gold Company, who have ever since been sole owners of the same, and in continuous possession of the land under the same.

The Michigan Gold Company were subsequently made parties to the bill, and adopted the answer of White and Mather as their own.

On the issue formed by these pleadings, testimony was taken in open court before Hon. C. B. Grant, circuit judge. Upon hearing, the bill was dismissed, with costs, and complainants appeal to this Court.

A careful examination of the record convinces me that

the main allegations of the complainants' bill are sustained by the proofs; that the lease of the "east 40" and the agreement for a lease of the "west 40" were executed and delivered upon the same day, and were substantially but one transaction; that Grummett was informed by Peter E. Gingrass, who was acting for, and had authority to act for, Victoria Gingrass, that the lease to Miner and Jones had been abandoned, and that there was nothing out against the land save an iron option to one Trathan, running for sixty days from November 16, 1886; that Peter E. Gingrass and his wife both believed and understood at the time they executed the lease and agreement to Grummett that the Miner and Jones lease had been forfeited, and that the "west 40," as well as the east one, was free and clear from all claims except the option of Trathan.

The testimony of Grummett is corroborated by that of Gardner, one of the subscribing witnesses to the agreement. The other, a daughter of Gingrass, was not sworn in the case. He is also corroborated by the testimony of T. J. Dundon, who drew and took the acknowledgment of the papers, in some particulars, and the fact that both of them were signed and delivered at one time is also confirmed by the evidence of Ashurst Bedford, who was present when they were executed and delivered.

The claim of Mr. and Mrs. Gingrass that the "west 40" was not talked about until after the "east 40" was leased, and that the arrangement was that the agreement for a lease of said "west 40" should be subject to the Miner and Jones lease, is not supported by the proofs, and is evidently an after-thought. I am satisfied that the agreement was made by Peter E. Gingrass and his wife at the time, in good faith, and so taken by Grummett. The proofs also show that Grummett entered into the good-faith possession of these lands, both under the lease

for the one, and the agreement for a lease of the other, and substantially kept and performed his part of the agreement under both instruments until he was prevented from so doing by the acts of Gingrass, White, and others.

Under the lease of the "east 40" the term was for 30 years, from and after June 1, 1887 (the day he was, under the agreement, to be given a lease of the "west 40"). No royalty or rent was to be paid upon the lease of this "east 40" until after June 1, 1887, except, if any ores were mined, one-tenth of the same were to be delivered to Gingrass. The taxes upon the land were not to be paid by Grummett except those assessed after June 1, 1887. Grummett agreed to commence exploring and searching for deposits or veins of gold and silver ores, minerals, and quartz, within 10 days from the date of the lease, and to prosecute such explorations vigorously and continuously with a force of not less than two men until a mine of these ores, quartz, or mineral should be discovered that could be worked to advantage. Cessation of work for 30 days should, at the option of the owners of the land, work a forfeiture of the lease.

There was no pretense on the trial that Grummett had forfeited his lease to this "east 40" or abandoned it. Indeed, both Peter E. Gingrass and Peter White were anxious, at the time the controversy about the "west 40" commenced, to waive all rights to this "east 40" in his favor, and White executed a lease of that 40 to Grummett. In consideration of this last lease, Grummett was asked to release or assign his interest in the "west 40," which he declined to do. While, under the agreement for a lease of the "west 40," Grummett was not required to make any explorations on the land until he received his lease, and then not until 10 days from its date, he nevertheless went onto this land and worked thereon, exploring

and digging for gold, before June 1, 1887, and afterwards.

There seems to be no reason, as far as the acts and conduct of Grummett are concerned, why he was not entitled to a lease on June 1, 1887, which lease he properly and sufficiently demanded. There was no perceptible default on his part. On the contrary, relying in good faith upon his agreement, which was recorded in the proper office, he expended time and money in working upon and prospecting this land with the consent and knowledge of both Gingrass and wife, and unmolested by any one, until the news went out that there had been a rich find of gold upon a piece of land adjoining this "west 40," and belonging to the Lake Superior Iron Company. This discovery became public on July 2, 1887. Great excitement ensued, and there was a general rush for property in that vicinity. On July 17, 1887, the defendant Foley put men at work on the "west 40," claiming under his option, and a few days later Peter White placed a force of men at work, also, on the land, claiming under his assignment of the Miner and Jones lease. A conflict for possession of the premises between Grummett, Foley, and White ensued, and several trespass suits were commenced. This bill was filed August 17, 1887.

Without at this time determining the rights of Foley, and those claiming under the Miner and Jones lease, let us see whether there is any legal reason why this agreement cannot be enforced in a court of equity as against the defendants Peter E. and Victoria Gingrass. There has been no default by Grummett, as before said. He has sufficiently kept and performed his agreement, and morally is entitled to a lease from the defendants Gingrass, in accordance with their written, solemn agreement, entered into without fraud on the part of the

complainant Grummett, and understandingly made by Gingrass and his wife.

Is there any reason in law or equity why Grummett should not have a specific performance of this agreement? I can find none. It is certain and specific as to all the details of performance, and nothing is left uncertain, or even to inference. It refers to the lease of the "east 40," and the lease to be given is to conform and agree in all its conditions to that lease. The lease intended by the parties of this "west 40" is therefore before the eye of the court, and the only function to be exercised is to decree its execution and delivery. There is nothing unfair or unequal about it, as it does not differ materially from the leases commonly and customarily used in the Upper Peninsula. Therefore, in my opinion, the complainants are entitled to the relief asked against the Gingrasses, unless, at the time of the agreement, the Miner and Jones lease was operative, and capable of enforcement by Peter White, the assignee of Miner and Jones.

It will be found from the record that Miner and Jones assigned their lease to Peter White on August 19, 1885, five days after its execution.

This lease also provided that the lessees should commence explorations within 10 days from its date, and should prosecute the same continuously with a force of not less than two men, until they had discovered and exposed a mine of good gold and silver, or gold or silver ore, quartz, or mineral, that could be worked to advantage, and that a cessation of work, for 30 days at any one time by the lessees, before such minerals were discovered, should work a forfeiture of the lease, at the option of the lessors, and that upon the failure of the lessees to keep any of the covenants or conditions of this lease the lessors might re-enter, with or without notice, and dis-

possess the lessees and all persons claiming under them.

The lessees commenced work on the land in the last of August or first of September, 1885; that is, Mr. White employed men and set them at work upon the premises. It is not shown that this work continued beyond November, 1885, and it is certain that White did no work of any kind upon the land under the Miner and Jones lease during the year 1886, nor until July, 1887, and after the find of gold, heretofore noted. Mr. White himself testifies that he did no more work upon the premises for the reason that he had done all that he felt called upon to do under the lease.

"I had found the vein of gold, and I intended to do so much work, or to pay the royalty when it came due the fourteenth of August, or abandon it,—one of the two,—whichever should be most favorable, I intended to pay it."

He further testifies that he did not develop the mine because he was in expectation all the time that the Lake Superior Company, owning the property immediately adjoining this land, would go ahead and improve it; and, if they did, it would save him a large amount of expense in developing this tract, for the vein could be traced right across from one to the other. Mr. White does not testify that he had any agreement with the Gingrasses that he might stop work and wait upon the luck of the Lake Superior Company, and he swears that he had no personal intercourse or correspondence with them about the matter until in June or July, 1887, when he was trying to fix the matter up with Grummett. In August, 1887, he paid to them $5,000 as royalty. This was after the discovery of gold by the Lake Superior Company.

According to his own evidence, he was waiting, without doing any work upon the land, from November, 1885, to

June or July, 1887, to see what the Lake Superior Company might find on their land, having it in his mind to throw up the lease or pay the royalty as might, under the developments in the future, seem best for his interests. He did not obtain the consent of Gingrass or his wife to this action, or, rather, non-action, of his, nor is it at all likely that they would have consented to such an arrangement as this, by which, if gold was found by the work of the Lake Superior Company so as to make the lease profitable to White, he should have it; but, if not, he might abandon it, without any payment of royalty to them, or any explorations upon the land.

White certainly, from his own testimony, forfeited his lease, and it was at the option of the Gingrasses, at any time after at least January 1, 1886, to re-enter and take possession of the premises without notice to White. And when they gave the agreement to Grummett, and Grummett went upon the land to work under it, in my opinion they exercised this option. The Miner and Jones lease was forfeited, and White dispossessed of all right and interest in the lands under it.

Foley is in the same condition as White. On September 12, 1884, he obtained from Peter E. Gingrass a mining option, giving him the right to explore for gold and silver thereon, and to take a lease of said lands for 20 years from September 1, 1885, at a royalty of 10 per centum of the gross receipts of the product of the mine or mines thereon. Foley took possession of the land, and did some work or exploration upon it that fall. August 24, 1885, he demanded a lease in writing, and claims that he had twice before that time made an oral demand. On the same day he posted notices on the premises that the land belonged to him under an option given him by Peter Gingrass. August 27, 1885, he mailed a notice of

like import to Miner and Jones, and also to Jopling and Hall, who were supposed to be representing Peter White.

At the time this demand was made by Foley the Miner and Jones lease had been executed 10 days, and also assigned to White. White soon after took possession under the Miner and Jones lease, excluding Foley. Foley seems to have been content with his demand for a lease, and its refusal, and the posting and mailing of the notices aforesaid, and took no further steps to enforce his claim, or to hold any interest in the land until after the gold discovery, when he appeared upon the ground, claiming possession, and the right to a lease under his option. For nearly two years he seems to have abandoned his claim to the land, and to have left it in the possession of White, Gingrass, and Grummett. It is claimed by his counsel that Grummett had notice of his option, but the notice he had was that such an option had been given, but that it had been thrown up and abandoned.

The option of Foley expired, by its own terms, on September 1, 1885. I am satisfied from all the evidence in the case that Foley abandoned all claim to the land, and intended to do so after the fall of 1885, and that he would never have renewed his claim had it not been for the find by the Lake Superior Company. His claim that he discovered a paying vein of gold is not borne out by the proofs. Neither is the claim of White, that he had discovered such a vein, established by the evidence. On the contrary, the conduct of each of them shows that they did not consider that it was worth their while to do any more work upon the premises, or to be at any further expense to hold or reclaim their rights until the work of others upon an adjoining piece of land had made a possibility a probability. At least the conduct of Foley was such that he cannot equitably defend against the relief asked in this case by Grummett. His laches

in not moving sooner against Gingrass to enforce his demand for a lease, while Gingrass was denying his right to a lease, and leasing to Miner and Jones, and agreeing to lease to Grummett, and in permitting the possession of the premises to be taken by Grummett without protest, must be regarded as an abandonment of his right to such lease, at least as far as Grummett is concerned. It is not necessary, therefore, to inquire whether or not his option was enforceable in case he had not abandoned it.

It is claimed that the defendant Mather, the assignee of White, is a purchaser in good faith, and that Grummett cannot have the relief prayed for on that ground. But Mather cannot be a purchaser in good faith, as this agreement of Grummett's was properly of record, and Grummett was also on the land, contesting the possession with both White and Foley, about the time White made his assignment to Mather. The Michigan Gold Company stands in the shoes of Mather.

The objections to granting the relief asked for by complainants in this suit, principally urged, are two,—

1. There is no mutuality in the agreement; and,—
2. Because the court could not adequately enforce the provisions of the lease if its execution were ordered.

The case of *Rust v. Conrad*, 47 Mich. 449 (11 N. W. Rep. 265), is relied upon to support these objections. But the Legislature of 1883, doubtless with the intention of meeting the decision of this Court in that case, provided by statute for the specific enforcement of options and mining agreements in a court of chancery. This act gives the holder of the option or agreement the—

"Absolute right to have such option or agreement specifically enforced in the circuit court, in chancery, of the county where the whole, or any portion, of such lands are situated, if not in default himself, and in such case the court shall have full power to compel the person giving such option, his heirs or assigns, to execute a lease

or license according to the terms thereof; and such court shall shall have the usual powers to enforce its decree as in other cases."

The act also provided that such options and agreements should be assignable. See Laws of 1883, pp. 57, 58. See, also, Id. pp. 152, 153.

I agree fully with the views of Mr. W. P. Healy, one of the counsel for the defendant Foley, in his brief filed in this case, that this law is a beneficial and equitable one, and one in harmony with the mining conditions of the Upper Peninsula. As Mr. Healy says:

"The Legislature could do no less. Nearly all the iron mines of the Upper Peninsula have been discovered by explorers,—poor men, who would be cheated out of their discoveries unless ample means were provided for compelling the land-owners to live up to their agreements. An action at law for damages would be entirely illusory, and the result would be that the development of the mineral wealth of the Upper Peninsula would be greatly retarded, if the law, as laid down by the Supreme Court [in *Rust v. Conrad*], had not been changed by the Legislature."

This act can be of no damage to the land-owner; for if it be true that there is no mutuality in the contract because the holder of the option may take a lease, or not, as he sees fit, yet, if the explorations of such holder (which he is generally obliged to make) result in the discovery of valuable mines upon the land, the land-owner is greatly benefited, whether the lease is taken or not; and, if no mines are found, the land-owner is to no expense, and has in either case the value of his land settled without cost or trouble to him. And if a lease is taken under the option, which can be surrendered by the lessee at any time by giving 30, or any other number of, days' notice, still the lessor has the benefit of the discoveries without expense; and if he is shut off from his royalty under that lease by its surrender, if his mine is

worth anything, he has the mineral open to be worked by himself or others; or if the vein is exhausted he has received all that in equity he ought to receive.

This act of 1883, to my mind, completely and rightfully removes these two objections to the specific enforcement of the Grummett agreement. And I think, also, that as far as options or agreements are concerned, given since the law of 1883 took effect, the section of the act making them assignable is constitutional and valid, in the absence of any clause in such option or agreement preventing such assignment. The party giving such option, or executing such agreement, must be presumed to know the law, and to act upon his knowledge of it, and if he does not insert therein a prohibition against an assignment without his consent, it will be taken for granted that he has no objection to its assignment.

The conclusion, therefore, is that the complainants are entitled to the relief asked by them. The other objections urged against the specific enforcement of this agreement are all based upon a supposed or claimed state of facts, which I do not find in the record, and therefore will not be noticed.

In my opinion the decree below should be reversed, and a decree entered here in conformity to the prayer of complainants' bill, with costs of both courts against the defendants.

Long, J., concurred with Morse, J.