REO MOTOR CAR CO. *v.* YOUNG.

1. SPECIFIC PERFORMANCE—CONTRACTS—FRAUD.
    In proceedings for the specific performance of a contract whereby defendant, on ceasing to act as plaintiff's agent, agreed to assign certain leases to plaintiff, and the latter agreed to buy the fixtures and other personal property, evidence *held*, insufficient to show that the written contract omitted part of the real agreement, either fraudulently or otherwise, or that there was sharp practice or overreaching on the part of plaintiff in procuring the same.

2. SAME—UNCONSCIONABLE CONTRACT—INADEQUATE CONSIDERATION.
    Nor was the evidence sufficient to establish defendant's claim that the contract was unconscionable because of inadequate consideration for the leases, fixtures, etc., since defendant, better than any one else, was in a position to know their true value.

3. SAME—MUTUALITY OF CONTRACT—ENFORCIBILITY — RULE — EXCEPTIONS.
    Although a technical rule has been announced by text writers

and courts that the remedy by specific performance must be mutual in order to make it available to either party, that is, unless the remedy is open to both it is open to neither. so numerous and so varied have been the exceptions tacked on, that it is at present of little value as a rule.

4. SAME.

Held, that plaintiff is not precluded relief on the doctrine that there must be mutuality of remedies.

5. SAME—NOT A REMEDY OF RIGHT—JUDICIAL DISCRETION.

The remedy by specific performance is not a remedy of right, but should be granted or refused in the exercise of a sound judicial discretion.

6. SAME—ADEQUATE REMEDY AT LAW.

Where the premises involved have for seven years been the salesroom of plaintiff's products, about 7,000 owners go there for parts and service, and other desirable locations have all been appropriated, held, that it cannot be said that plaintiff has an adequate remedy at law, and the decree of the court below for specific performance is therefore affirmed.

Appeal from Wayne; Dingeman (Harry J.), J. Submitted January 23, 1920. (Docket No. 84.) Decided April 10, 1920.

Bill by the Reo Motor Car Company against Matthew A. Young for the specific performance of a contract. From a decree for plaintiff, defendant appeals. Affirmed.

*Keena, Lightner, Oxtoby & Hanley* (*Milo H. Crawford*, of counsel), for plaintiff.

*Frank A. Martin* (*James O. Murfin* and *Percy W. Grose*, of counsel), for defendant.

FELLOWS, J. The defendant for some 17 years had been a successful dealer in automobiles and accessories in the city of Detroit. In 1912 he began under a contract for a year to handle cars made by the plaintiff.

He had a desirable location at 752-758 Woodward avenue, with a service station on Forest avenue east. This property, at the time of the transaction out of which this litigation arose, was leased from three different owners under leases hereinafter more particularly described. The parties seem to have been mutually satisfied with their dealings and new contracts were entered into for succeeding years, the last one being executed July 27, 1918, and expired by its terms July 31, 1919. These contracts seem to have been profitable to defendant and the testimony fairly discloses that he had laid away a competency and could live from his income. During and succeeding the war plaintiff was unable to supply defendant with all the cars he could sell but he testifies that he made money even in the lean years. Plaintiff could sell all the cars it could make during these years without effort, and defendant was among its preferred distributors. He was complimented on occasions by plaintiff's officers and agents, and efforts were made as far as possible to supply his needs for cars. In the spring of 1919 the plaintiff by its board of directors decided upon a change of policy in the disposition of its product in Detroit. It determined to establish a factory branch there and handle the business itself. Very shortly after the final decision of the board on this subject, and on May 6th, this fact was communicated to defendant at the office of the company in Lansing, the defendant and Mr. Cole, his sales manager, having come to Lansing that morning. There is a decided conflict in the testimony as to what took place at the Lansing meeting, but it is agreed on all hands that the conference lasted until lunch time and the written agreement was not prepared until afternoon. The trial judge in his opinion, speaking of the agreement and the claim that it did not contain all the terms agreed upon, said:

"In my opinion, the written contract embodies all of the terms of the arrangement made between the parties. The defendant is a shrewd business man, and after his surprise and disappointment on learning that his contract was not to be renewed, sought to make the best arrangement with plaintiff that he could with the view to retiring from business. The arrangement which was made was based almost entirely upon his own suggestions, and I am satisfied that it was thoroughly understood between the parties."

The agreement that day executed is as follows:

"This agreement by and between Reo Motor Car Company, a Michigan corporation, hereinafter designated as the vendee, party of the first part; and M. A. Young, of Detroit, Michigan, hereinafter designated as the vendor, party of the second part:

"Witnesseth: That whereas, the vendor is and for several years has been distributor in Detroit for Reo automobiles and automobile trucks, manufactured by the vendee; and whereas, the vendee is contemplating establishing a branch house in Detroit on or about August 1, 1919, for the distribution of Reo automobiles and automobile trucks; and whereas, it is the mutual desire of the vendor and the vendee that the vendee shall relieve the vendor of obligations in the nature of unexpired leases of property now used in the conduct of the vendor's business;

"Now, therefore, for and in consideration of the mutual undertakings hereinafter expressed; and for and in consideration of the sum of one dollar ($1) by the vendee to the vendor in hand paid, the receipt whereof the vendor hereby acknowledges, the parties hereto agree and contract as follows:

"1. The vendor will execute forthwith an assignment of the unexpired portion of each of three several leases, which said assignments shall run to Reo Motor Car Company and shall become effective on August 1, 1919. The leases herein referred to are as follows:

"(a) A lease on the first floor of the building located at 752-756 Woodward avenue, Detroit, which lease covers the quarters now used by the vendor as an automobile salesroom and office and which lease expires approximately February 1, 1921. (It is agreed

that the monthly rental stipulated by said lease is not in excess of $300.)

"(*b*) A lease, expiring on or about May 1, 1922, on the building at 758 Woodward avenue. This lease is subject to a sub-lease from the vendor to Meisner Tire Company, under which the Meisner Tire Company pays to the vendor a monthly rental of $175, for the front part of said building. In assuming the vendor's obligations as lessee under the original, it is understood that the vendee also succeeds to his rights under the sub-lease, including the right to the monthly rental from Meisner Tire Company.

"(*c*) A lease, expiring approximately June 1, 1920, on the building (now occupied by the vendor as a service station) situated at 212-214 Forest avenue E.; it being understood that the monthly rental under said lease is not in excess of $200.

"2. The vendee agrees to accept the assignment of the said three leases, and to assume the lessee's obligations thereunder, from the date the assignments become effective and the vendee takes possession of the leased premises.

"3. The vendor agrees to sell to the vendee, and the vendee agrees to buy, all office fixtures (including safes, typewriters, desks, chairs, tables, etc.), whether such office fixtures are in use at the sales room or the service station; all tools and equipment of every kind used by the vendor in the conduct of his business; and good will and the vendee agrees to pay therefor the sum of twelve hundred fifty dollars ($1,250) which payment shall be made at the time that the actual transfer is made, which in no event shall be later than August 1, 1919.

"4. The vendee agrees to purchase from the vendor on or prior to August 1, 1919, all used cars (not exceeding a total of twelve) which the vendor shall have on hand unsold at the close of business on July 31, 1919. The price to be paid the vendor for said used cars shall be determined by an appraisal of three persons, two of whom are to be appointed by F. H. Akers, sales manager of the vendee, and the third to be appointed by the vendor.

"5. As soon as possible after the close of business on July 31, 1919 (or sooner if practicable) the vendee

.will repurchase from the vendor all new automobile parts for Reo automobiles and trucks, which the vendor shall at that time have in his possession unsold. The price at which these parts shall be repurchased shall be the then current price at which such parts are sold by the vendee to its distributors.

"6. The vendor will permit the vendee, if it so elects, to put decorators at work either at the salesroom or the service station or both, at any time after July 1, 1919, for the purpose of redecorating or making necessary changes, provided, however, that such work shall be done in such manner as to interfere as little as possible with the continued operation of the vendor's business.

"7. It is mutually understood that for the remainder of the vendor's contract with the vendee—that is to say, until July 31, 1919—the vendee will continue to accord the vendor the same preferential treatment on deliveries as in the past; it being the purpose of this agreement that the termination of the long-existing relationship shall be as mutually pleasant as has been the relationship itself.

"In witness whereof, the parties have caused these presents to be executed this sixth day of May, 1919.

"REO MOTOR CAR COMPANY,
"a Michigan Corporation,
"The Vendee,
"By F. H. AKERS, Sales Manager.
"M. A. YOUNG,
"The Vendor.

"Witnesses:
"WILLIAM COLE,
"CLARENCE E. ELDRIDGE.
"Executed in duplicate."

On the day following this agreement defendant notified plaintiff that the leases contained provisions that they could not be assigned without the consent of the lessors and that the lessors refused such consent. While defendant denies that he had importuned such lessors to refuse their consent, we are satisfied from the disinterested testimony that such was the fact. A representative of plaintiff went to Detroit and saw

defendant on the 8th; he also saw the lessors or their representatives, and subsequently all the lessors consented in writing to the assignment of the leases. At the conference between defendant and plaintiff's representative on May 8th, defendant refused to assign the leases, stated he was going to continue in business, and flatly refused to carry out the terms of the agreement of May 6th. This bill for the specific performance of the agreement was filed shortly afterwards and from a decree for plaintiff, defendant appeals.

It is the claim of the plaintiff that this contract was fairly entered into and that there is no obstacle either upon the facts or the law to its enforcement by decree of specific performance. It is the claim that largely the provisions in the contract were made at the suggestion of the defendant; that he stated he was going out of business and that it was at his solicitation that the company took over the leases and assumed his liability under them; that the location had long been the salesroom in Detroit for Reo cars; that other locations which may be obtained are not as commodious or as well situated for the automobile business; that the terms of the contract having reference to the fixtures, etc., were also made upon the decision of the defendant to take a much needed rest and get out of the business, and that upon that basis all the terms of the agreement are fair and equitable to the defendant.

The claim of the defendant is thus summarized in the brief of his counsel:

"The defendant claims that under the proofs the contract lacks mutuality, has arisen through fraud and overreaching, shows a want of a fair consideration. That to grant specific performance is to work a substantial hardship upon the defendant without a commensurate benefit to the plaintiff. That specific performance is not a matter of right, and that the equities as shown by the testimony are against the plaintiff. That so far as the leases are concerned, no considera-

tion passed for their transfer. That plaintiff in agreeing to accept the assignment was relieving the defendant of a liability and was so relieving the defendant for the benefit of defendant. That it appears from the contract and all of the circumstances surrounding its execution that there was overreaching and unfairness on the part of the plaintiff. That in any event the plaintiff has a complete and adequate remedy at law and is not entitled to relief in equity."

We shall first consider the facts. Upon the crucial ones the testimony is in direct conflict. Some of the undisputed facts, the circumstances of the transaction and the conduct of the parties, however, throw light upon them and are helpful in reaching a conclusion. That all of the parties are hard-headed, intelligent business men, accustomed to dealing in matters involving hundreds of thousands of dollars is clearly established. That they dealt at arms length is also, we think, beyond cavil. Defendant claims that the written contract did not contain all the engagements of the parties, and upon the trial particularly stressed his claim that it was a part of the agreement that plaintiff should take over his entire organization and assume contracts made by him with his two brothers and with Cole. In view of the claim of fraud and overreaching, we consider the evidence bearing on this claim. The forenoon was consumed in coming to an agreement and it was not until afternoon that the preparation of the written contract was taken up. It was prepared by Mr. Eldridge, assistant sales manager of the plaintiff, and we are satisfied that defendant gave him the greater part of the information from which he made his notes which were used in the ultimate preparation of the writing. It is admitted that as each page of the contract was written by the stenographer in an adjoining room it was brought into the room where the parties were and was read over by both defendant and his sales manager Cole, and

that neither suggested that any addition or change be made to it. Mr. Cole was a successful salesman, intelligent, and, we think the record fairly discloses, alert to his own interest and watchful that such interest should be safeguarded and protected. When he became sales manager for Mr. Young he insisted upon a written contract on this subject; he testified:

"I would not consider a job a position at all if I didn't have a contract. I had a contract with Mr. Young all the time. I told him what I wanted. I wanted it in writing, I have always had it in writing; I wanted it in writing. The day he told me he would engage me as manager and pay me $5,000 and one per cent., the first thing I said is, 'I want that in writing.' We drew up an agreement. I said I wanted it in writing. I said when I took the position as manager I wanted it reduced to writing."

It is somewhat difficult to reconcile this predilection on the part of Cole for written evidence of his employment and its terms with his testimony given in support of defendant's claim that it was a part of the agreement that plaintiff take over the entire organization of defendant and that it was expressly agreed that the company should assume defendant's contract with Cole and continue him as its sales manager during the coming year.

The first intimation from defendant to plaintiff that he did not intend to carry out the contract of May 6th was based on his claimed failure to secure the consent of the lessors to the assignment of the leases, and it was not until the trial that he claimed the failure to assume the contracts of his brothers and Cole was one of his principal reasons for repudiating his contract. He testifies:

"Q. When was the first time that you ever gave any information to the Reo Company, its employees, officers, attorneys, or any one else, that one of the principal reasons for your breaking this contract was

that Cole and William Young's contracts — William Young is the correct name?

"*A.* William J. Young.

"*Q.* When was the first time you ever mentioned that?

"*A.* Never."

Nor are we convinced that a part of the consideration of the contract of May 6th was the agreement of plaintiff to furnish defendant 40 cars in addition to his allotment. It is undoubtedly true, as stated by Mr. Akers, plaintiff's sales manager, that after the agreement was executed, and agreeably so, he voluntarily promised to furnish additional cars prior to August 1st. We think the proof establishes that this voluntary promise was carried out to the extent of 40 cars, upon which defendant's profit was $12,000.

Without further discussion of the testimony and the circumstances surrounding the execution of the contract, it will suffice to state that we are satisfied that the contract embodies the agreement of the parties, and that defendant has not shown that any of such agreements were omitted from the written contract either fraudulently or otherwise; that the contract was entered into by defendant with a view of going out of the business; and that several of the obligations of plaintiff were assumed by it to cause defendant as little loss as possible.

But it is insisted that the contract was procured by sharp practice and overreaching. It is pointed out that defendant had been complimented, that agents of the company had said to him that he would be kept with the company as long as he wanted to stay; that it was suggested to him that he enter into the contract with Cole, that he establish a profit-sharing plan with his employees; that he was encouraged in expending money in advertising; that a larger service station was suggested; that he was given to understand that his contracts would be renewed from year

to year, or a perpetual one given him, and in fine that he was assured that he was indispensable to the company. We think the record fairly discloses that the dealings of the parties had been mutually satisfactory; the company through its agents undoubtedly did compliment defendant's success in the way he conducted his business and sold cars, and undoubtedly suggested matters which were thought to be of mutual advantage, but we cannot feel that this was done from anything but the best of motives, or that it was designed to put defendant in a frame of mind where an unconscionable contract could be procured from him. Defendant had been a valuable customer of the company, but he had profited considerably by his dealings with it and for the last two years he handled its cars he got cars to sell when others did not. We entertain no doubt that the contract with defendant would have been renewed from year to year if plaintiff had continued to handle its product in the way it had. But these contracts were annual ones, executed each year, having no binding force beyond a year, and were subject to cancellation on 30 days' notice; all of which was well known to defendant. The demand for cars had grown so that it was over three times plaintiff's output and no one can doubt its right to change its policy with the change of conditions. It would establish unheard of propositions to hold that one was bound to deal with another forever simply because he expressed satisfaction with his relations or that he was bound in law to make a new contract because an old one had been satisfactory. There was no sharp practice or overreaching in procuring this contract. The plaintiff decided to change its plan of handling the sale of its cars in Detroit. This it had an undoubted right to do; with reasonable promptness defendant was advised of the change; this was fair treatment to him. He decided to go out of the business

and procured a contract that would assume many of his obligations and protect him from loss; this was strictly a business question to settle and the parties settled it in a business way with the result that the contract was executed.

Was the contract unconscionable? We think not. Defendant insists the leases were valuable, that the fixtures, etc., were worth much more than plaintiff agreed to pay, that the good will of the business was worth a considerable sum, and that the provisions for arbitration of the value of the used cars was unfair. Undoubtedly these leases to one desiring to conduct the business of selling automobiles were valuable, but if that was a fact no one knew it better than defendant. It would be a violent presumption to assume that Mr. Akers, who lived in the little town of Williamston, and who did business in Lansing, knew more about the value of leases on Woodward avenue property than did the defendant who for many years had occupied this location and had watched the development of Detroit and knew, if any one did, what their value was. So as to the fixtures. Mr. Young wanted $1,500 for them; Mr. Akers offered $1,000; after some discussion they split the difference. Defendant now insists that they are worth many thousand dollars. But he, better than Akers, knew what they were worth; he asked as his first price $1,500, and agreed to take $1,250. The used cars were but a small factor in the negotiations. It is highly improbable that either party, when the contract was made, expected any difficulty in agreeing upon their value. If the defendant had then intended to continue in business his good will was a valuable asset. But the contract was made by him with a view of quitting the automobile business and taking a much needed rest. This was the condition confronting Mr. Young when he made the contract. It was made with that in view.

Upon the hearing of the case, however, plaintiff's counsel stated that plaintiff had no desire to prevent Mr. Young from continuing in business and expressly waived that clause of the contract. Indeed, much of this discussion is academic, as outside the assignment of the leases all provisions of the contract have either been adjusted by the parties or their specific performance waived by the plaintiff. Plaintiff has been most considerate of defendant and his rights in view of his uncompromising attitude of persistent refusal to abide the provisions of the contract he entered into with its accredited officer. The facts are unquestionably with the plaintiff and unless some rule or rules of law prevent, it is entitled to here prevail.

It cannot be claimed that there is a want of mutuality of obligations in the contract in question; we do not understand defendant so claims. What he does claim, as we understand it, is that there is a want of mutuality of remedy so as to preclude the right to the particular remedy here sought, that of specific performance. It is undoubtedly true that a technical rule has been announced by text writers and courts that the remedy by specific performance must be mutual in order to make it available to either party; that unless the remedy is open to both, it is open to neither. Thus it was said by Lord Justice Fry in his work on Specific Performance (Fry on Specific Performance, § 460), in speaking of that remedy:

"A contract to be specifically enforced by the court must, as a general rule, be mutual—that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other of them. When, therefore, whether from personal incapacity to contract, or the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is, generally, incapable of enforcing it against the other, though its execution in the latter way might in itself

be free from the difficulty attending its execution in the former."

But his Lordship recognizes that there are exceptions to this rule, and so numerous and so varied have been the exceptions which have been tacked on to the rule that it is at present of little force as a rule. In the latest edition of Pomeroy's Equity Jurisprudence, furnished the profession last year, and prepared by Mr. John Norton Pomeroy, Jr. (5 Pomeroy's Equity Jurisprudence, § 2191), it is said:

"The frequent statement of the rule of mutuality— 'that the contract to be specifically enforced must as a general rule, be mutual—that is to say, such, that it might, at the time it was entered into, have been enforced by either of the parties against the other,' is open to so many exceptions that it is of little value as a rule. But in view of the firm place that the doctrine of mutuality has obtained in the courts of equity, it seems well to attempt a restatement that shall be more free from exceptions. The following forms seem to meet the cases generally. 'Equity will not compel specific performance by a defendant, if after performance the common-law remedy of damages would be his sole security for the performance of the plaintiff's side of the contract.' 'The court will not grant specific performance to plaintiff and at the same time leave defendant to the legal remedy of damages for possible future breaches on plaintiff's part.' This rule, it is believed, covers the circumstances in equity where, according to the weight of authority, the court refuses its aid for lack of mutuality."

The article in Cyc. on the subject of Specific Performance was also prepared by Mr. Pomeroy. Considering the question of mutuality of remedies, it was there said (36 Cyc. p. 622):

"The requisite of 'mutuality of remedy,' that is, that the remedy of specific performance must be available against plaintiff in order that complete relief may be given in the single suit stands upon a firmer footing. The court will not grant specific performance to

plaintiff and at the same time leave defendant to the legal remedy of damages for possible future breaches of the contract on plaintiff's part. The rule is enacted by statute in a few States. This mutuality of remedy, however, need not have existed prior to the time of the decree."

It was held by the supreme court of Minnesota, in *Brown* v. *Munger*, 42 Minn. 482 (44 N. W. 519) ; we quote from the syllabus:

"In order that specific performance of an agreement for the sale, exchange, or conveyance of land be decreed, it is not absolutely essential that there be mutuality of remedy *ab initio*. But the mutual enforcement of the contract should be practicable when specific performance is adjudged. The court should then be able to enforce by its decree all of the terms, *in præsenti;* should have the power to supervise the performance of the contract by each of the parties, and in all of its parts."

In an able article by Prof. Ames in 3 Columbia Law Review, pp. 1, 8, after stating and reviewing eight exceptions to the rule, it is said:

"It is evident, from a consideration of the eight classes of cases just discussed, that the rule of mutuality, as commonly expressed, is inaccurate and misleading. The reciprocity of remedy required is not the right of each party to the contract to maintain a bill for specific performance against the other, but simply the right of one party to refuse to perform, unless performance by the other is given or assured."

The case of *Rust* v. *Conrad*, 47 Mich. 449, relied upon by defendant, is not out of accord with the authorities cited, nor is it subject to the criticism indulged in by some text writers and courts. In that case the bill was filed to procure specific performance of an agreement to make a lease. But by the terms of the agreement the lease was to contain a provision which permitted plaintiff to surrender the premises, thus cancelling the lease. In other words, the bill

sought to compel the execution of a lease which might be nullified instantly upon its execution. It was held that the courts would not do an idle thing. It was there said:

"But the court will also refuse to interfere in any case where, if it were to do so, one of the parties might nullify its action through the exercise of a discretion which the contract or the law invests him with. The refusal in such a case does not depend of necessity upon any illegality, inequality, or unfairness, but it is sufficiently based upon the impropriety of imposing on the judge the labor, and on the public the expense of an investigation of disputes when the circumstances are such as to preclude any judgment that may be rendered from being final. No court can with reason be called upon to do a vain thing."

The case was correctly decided. It does not go to the length defendant claims for it, nor is it out of accord with the authorities cited.

In the instant case plaintiff has performed or tendered performance of all its obligations incurred in the contract. Defendant claims no rights, either legal or equitable, under it; he seeks no remedy, either legal or equitable, against plaintiff. He absolutely repudiates the contract and denies that he is bound by it. It would be an anomalous situation indeed to permit defendant, who claims no rights and seeks no remedy, to invoke the technical rule unmodified by exceptions or the trend of later authorities, that unless he has a remedy by specific performance plaintiff may not invoke it. The plaintiff is not precluded relief on the doctrine that there must be mutuality of remedies.

The remedy by specific performance is not a remedy of right. The relief should be granted or refused in the exercise of a sound judicial discretion. In the case of *Nowicki* v. *Kopelczak*, 195 Mich. 678, we said:

"The granting relief by specific performance of a
209—Mich.—38.

contract is not a remedy of right, but rests, and should rest, in sound judicial discretion.   It should be refused where the party has a complete remedy at law, but where the remedy at law is inadequate, and the plaintiff has clearly established his right to such relief, so that the judicial discretion is moved, courts should not withhold or hesitate in granting the only relief adequate in the case."

The premises here involved have for seven years been the salesroom of the Reo car and trucks.   Here some seven thousand owners of that make of car go for their parts and service; it has become recognized as the Reo headquarters for Detroit and vicinity.   It is much better adapted for plaintiff's purpose than any other location it is able to obtain.   In fact the testimony discloses that the desirable locations for salesrooms for automobiles have all been appropriated.   Plaintiff's damages could not be compensated in dollars and cents.   We think it has pursued the proper remedy and that the relief sought should be decreed.

We therefore affirm the decree, with costs to plaintiff.

MOORE, C. J., and STEERE, BROOKE, CLARK, BIRD, and SHARPE, JJ., concurred.   STONE, J., did not sit.