GILLETTE v. METZGAR REGISTER CO.

PATENTS — CONTRACTS FOR ASSIGNMENT LACKING IN MUTUALITY
SHOULD BE RESCINDED.

Where a contract for the assignment. of a patent on end-grained wheels for trucks, dynamos, and machinery, drawn by the president of the assignee, is ambiguous and lacking in mutuality, it being doubtful if there was a meeting of the minds of the parties on the meaning of the only term imposing any obligation on the assignee, who reserved to itself the right to render it inoperative and nugatory, and, if allowed to stand, would result in the assignee's obtaining the patent without any adequate compensation, the assignor is, in equity, entitled to rescission.

Appeal from superior court of Grand Rapids; Verdier (Leonard D.), J. Submitted April 26, 1928. (Docket No. 61, Calendar No. 33,526.) Decided June 4, 1928.

Bill by Herbert B. Gillette against the Metzgar Register Company for rescission of a contract on the ground of fraud. Defendant filed a cross-bill for specific performance. From a decree for defendant, plaintiff appeals. Reversed, and decree entered for plaintiff.

*Phelps & Paley,* for plaintiff.

*Laurence W. Smith,* for defendant.

POTTER, J. Plaintiff filed his bill of complaint against defendant alleging ownership of a patent on end-grained wheels for trucks, dynamos, and machinery, and that he made a contract with defendant, as follows :

On right of court of equity to refuse aid to specific performance of unconscionable contract, see 25 R. C. L. 222; 3 R. C. L. Supp. 1413; 4 R. C. L. Supp. 1575; 6 R. C. L. Supp. 1460.

"An agreement entered into by and between H. B. Gillette, party of the first part, and the Metzgar Register Company, party of the second part, both of Grand Rapids, Michigan, U. S. A.

"Whereas, the said party of the first part has invented a certain new and useful, end-grained wheel for trucks, dynamos, etc., and does hereby agree to transfer and assign to the said party of the second part all patents or patents pending covering same or any new improvements he may evolve pertaining to same or to any device or article kindred to it for and in consideration of certain provisions hereinafter specified, and

"Whereas, the said Metzgar Register Company, party of the second part, purchases all rights and title to said device along with all improvements on this or any kindred line that may be made in the future by the said party of the first part, with the understanding that all patents relating to said device that are to be assigned to the Metzgar Register Company shall remain their property as long as they are in operation, but that in case of insolvency or bankruptcy all patents assigned by the said H. B. Gillette shall revert back to him, and

"Further, it is agreed that should the Metzgar Register Company fail to supply the necessary machinery for at least one unit to manufacture said wheel this contract shall become null and void.

"Now, therefore, it is agreed that the party of the second part shall pay to the party of the first part a royalty of five cents (5c) per wheel on all wheels sold and paid for. All royalties are to be credited to the account of the said H. B. Gillette upon settlement of accounts by purchasers of same, and remittances are to be made to the party of the first part either in periods of thirty (30), sixty (60), or ninety (90) days.

"Further, it is agreed that the said party of the second part shall give to the said H. B. Gillette five thousand dollars ($5,000) of common stock in the company to be put in escrow and delivered to him as soon as the earnings are sufficient to warrant the payment of a 6 per cent. dividend on stock outstanding.

243—Mich.—4.

"This contract becomes effective as soon as it is signed by the interested parties and two witnesses.

"Party of the First Part:  HERBERT B. GILLETTE.
"Party of the Second Part:  METZGAR REGISTER CO.,
                            By LEROY METZGAR,
                                      President.
                        By

    "(Seal of
Metzgar Register Co.)
"Witnesses:
    "M. L. COCKRAN,
    "PHOEBE J. NEVE.
    "Date May 16, 1922."

Plaintiff alleges "one unit of machinery" as mentioned in the contract was understood to mean one shingle machine or its equivalent, together with necessary appliances, tools, and machinery to operate the shingle machine at full capacity; to assemble and furnish the wedges or parts of the end-grained wheels to the full capacity of the shingle machine; that defendant failed and refused to perform its agreement and install one unit of machinery, is insolvent and unable to carry out the contract, has failed and refused to pay plaintiff royalties, as provided in the contract, and has informed him it does not intend to carry out the contract; that the patent and inventions are of no value to defendant; the contract is without legal effect, without consideration, unilateral and void, but causes doubt and uncertainty as to plaintiff's right and title to said invention and patent. The bill of complaint was amended to allege that at the time the contract was made defendant did not have authority to make it, that it was *ultra vires.* Plaintiff asks for rescission and cancellation of the contract. Defendant, by its answers, denied all plaintiff's allegations of wrongdoing and asked for specific performance of the contract to assign and transfer the plaintiff's patents to it. The trial court dismissed plaintiff's bill of complaint, decreed specific performance on defendant's

answer in the nature of a cross-bill, and plaintiff appeals.

By the contract defendant did not agree and undertake to manufacture any end-grained wheels of any kind, any time, anywhere. It did not undertake and agree to sell or attempt to sell any end-grained wheels manufactured under plaintiff's patent or otherwise of any kind, any time, anywhere. The contract provides it is to become effective when signed by the parties. The clause in the contract effective against the plaintiff was the assignment and transfer by him to defendant of his patent for end-grained wheels. After signature of this contract, defendant was under obligation "to install one unit to manufacture said wheel," which might be new or old, owned or unowned, by defendant at the time the contract was made. If this "one unit to manufacture said wheel" was installed, it was the property of defendant and not plaintiff and continued to be defendant's property. Defendant did not agree to operate this unit when installed, to manufacture the patented end-grained wheels. There is nothing to show what one unit to manufacture said wheel was or was intended to be. The term is not defined in the contract. The parties are in dispute as to what was meant by the expression as used in the contract "one unit to manufacture said wheel." They were in dispute at the trial. There is no evidence the minds of the parties met,—that each party to the contract understood the expression "one unit to manufacture said wheel" in the same way, when the contract was signed. The expression meant different things to each of the contracting parties. The proof is practically undisputed, if we credit the testimony of both the plaintiff and Mr. Metzgar, that the minds of the parties never met as to what was meant by the only term of the contract that expressed any obligation on the part of defendant. The contract was ambiguous. Where a contract contains an ambiguous

expression, the court will refuse to enforce it in a sense in which one of the parties did not understand it. In such case there is no real meeting of the minds of the parties. 36 Cyc. p. 605. A court of equity will refuse specific performance of a binding contract "if not clearly satisfied that it embodies the real understanding of the parties." *Chambers* v. *Livermore,* 15 Mich. 381.

Defendant agreed to escrow $5,000 in par amount of its common capital stock and to deliver such stock to plaintiff when the earnings of defendant became sufficient to warrant payment of a dividend of 6 per cent. on the defendant's outstanding capital stock. No limit was placed by the contract on the amount of capital stock that was to be outstanding. There is nothing to indicate what ratio the possible prospective holdings of the plaintiff were to bear to the total capital stock of defendant. No time limit was fixed by the contract in which the 6 per cent. stock dividend was to be paid. No limit was placed in the contract as to when the stock would become the property of plaintiff. Defendant might pay 5.99 per cent. dividend annually indefinitely and plaintiff would not be entitled to the stock escrowed or the dividends thereon. Mr. Metzgar was in control of defendant. It rested with Mr. Metzgar to determine whether plaintiff ever received any stock or dividends. The defendant evidently did not intend to manufacture the wheel patented by the plaintiff after it obtained the assignment of plaintiff's patent. Plaintiff entered the employ of defendant. A few wheels were manufactured and sold. Defendant then began to manufacture a wheel of its own, not covered by the patent of plaintiff; and defendant's president, Mr. Metzgar, applied for a patent in his own name on end-grained wheels, ceased to manufacture plaintiff's wheels, and discharged the plaintiff from defendant's employ. De-

fendant continued to manufacture and sell wheels covered by Mr. Metzgar's patent, and now insists the plaintiff is not only not entitled to a reassignment of his patent, but that defendant owns the patent and is entitled to a decree of the court placing the seal of approval upon the contract, in so far as it attempts to assign and transfer the title of plaintiff's patent to defendant.   If defendant does own plaintiff's patent, it has parted with nothing to obtain the title to it.   It did pay plaintiff some royalties on the basis of five cents a wheel, but in so doing it obtained payment for its wheels at the price fixed by it.   Defendant's president did not prepare a license contract with plaintiff under which defendant could manufacture and sell end-grained wheels covered by plaintiff's patent on a royalty basis.   Instead of so doing, he prepared a contract operative on its execution by which plaintiff assigned and transferred his patent to defendant, along with all improvements on this or any kindred line that may be made by plaintiff.

The contract provides, in case defendant shall become insolvent or bankrupt, plaintiff's patent assigned to defendant shall revert to him.   It is not claimed defendant is bankrupt.   If defendant owes more than it can presently pay, if its liabilities exceed its assets, it is, in the ordinary acceptation of the term, insolvent. The bill herein was filed July 1, 1925.   The January 1, 1924, financial statement of defendant showed assets of $174,361.68 and liabilities of $180,872.21.   Among the assets listed are "patents and good will" valued at $47,486.87.   Defendant's statement of January 1, 1925, showed the items "patents and good will" placed in the financial statement at $47,668.52.   Defendant also listed among its capital assets unsubscribed capital stock to the extent of $32,800, and by including these two items of slightly over $80,000 it showed assets of $169,309.62 and liabilities of $182,500.   It showed

a real estate mortgage of $30,000 upon its real estate. It was running at a loss. Its deficit from operation was increasing. The padding of the statement of assets by such items as "good will" and "unissued capital stock" is not convincing.

After the parties began negotiating, plaintiff drew two contracts which he submitted to Metzgar. They were unsatisfactory. Plaintiff suggested they visit an attorney. Defendant's president said he had studied law and would prepare the contract. Plaintiff was an old man 70 years of age, an impecunious inventor. Defendant was represented by its president, Mr. Metzgar, an able and shrewd business man familiar with the law. Under the circumstances the burden was upon defendant to show fairness in the transaction, and adequateness of consideration. 1 Story's Equity Jurisprudence (14th Ed.), § 311. *Coveney* v. *Pattullo,* 130 Mich. 275.

If nothing further is done defendant will own the patent. Plaintiff will have received nothing. This contract was drawn in the interests of the purchaser. It was one-sided, unjust, and unconscionable. Specific performance ought not to be granted. 5 Pomeroy's Equity Jurisprudence (4th Ed.), §§ 2207, 2209; 25 R. C. L. p. 222; 36 Cyc. p. 612; 1 Page on Contracts, § 642; *Rust* v. *Conrad,* 47 Mich. 449 (41 Am. Rep. 720); *Van Norsdall* v. *Smith,* 141 Mich. 355; *Solomon* v. *Shewitz,* 185 Mich. 620 (3 A. L. R. 557); *Reo Motor Car Co.* v. *Young,* 209 Mich. 578; *Goodman* v. *Wobig,* 216 Mich. 51; *Lingemann* v. *Naoumson,* 237 Mich. 557; *Linsell* v. *Halicki,* 240 Mich. 483.

In 5 Pomeroy's Equity Jurisprudence (4th Ed.), § 2207, p. 4945, it is said:

"The contract must be perfectly fair, equal, and just in its terms and its circumstances. The contract and the situation of the parties must be such that the remedy of specific performance will not be harsh or oppressive. 'If, then, the contract itself is unfair,

one-sided, unjust, unconscionable, or affected by any other inequitable feature; or if its enforcement would be oppressive or hard on the defendant, or would prevent his enjoyment of his own rights, or would work any injustice; or if the plaintiff has obtained it by sharp and unscrupulous practices, by overreaching, by trickery, by taking undue advantage of his position, by non-disclosure of material facts, or by any other unconscientious means,—then a specific performance will be refused."    *    *    *

In 5 Pomeroy's Equity Jurisprudence (4th Ed.), § 2209, p. 4948, it is said:

"Even though the plaintiff was free from intention to take an unfair advantage, if the actual result is an inequality and unfair advantage equity will not aid the plaintiff."

In a note it is said:

"Apart from any consideration of sharp practice, or proved inequitable conduct, or inequality in the capacity of the parties, the courts in many cases, in the exercise of a true equitable discretion, have refused specific performance, because the contract in its terms was too unfair or one-sided for enforcement by a court of conscience."

In 25 R. C. L. p. 222, it is said:

"The unfairness of a contract is among the causes which will induce a court of equity to refuse its aid, and if to unfairness are added other elements showing that it is not equitable, specific performance will be unquestionably denied. The reason for this doctrine lies in the theory that a court of chancery assumes jurisdiction only on the principle that it would be unjust and inequitable to permit the contract to remain unenforced, and will not lend its aid to carry out an inequitable contract, or an unconscionable bargain."

In 36 Cyc. p. 612, it is said:

"There is a wide range of contracts which in their inherent nature, and apart from any special relation of the parties, are so unfair, one-sided, and inequitable that, notwithstanding their legal validity, a court of

conscience must decline to give its active aid in their enforcement."

In 1 Page on Contracts, § 642, it is said:

"Equity will not enforce an unconscionable contract. Specific performance will be refused."

These principles have been frequently applied by this court.

In *McMurtrie* v. *Bennette,* Har. Ch. 124, it is said:

"It is not a matter of course to decree specific performance of contracts. It requires a sound discretion, upon a view of all the circumstances; and this discretion must not be arbitrary and capricious, but must be regulated upon grounds that will make it judicial."

In *Solomon* v. *Shewitz,* 185 Mich. 620, 631, it is said:

"The jurisdiction of a court of equity to decree the specific performance of contracts is not a matter of right in the parties to be demanded *ex debito justitiæ,* but applications invoking this power of the court are addressed to its sound and reasonable discretion, and are granted or rejected according to the circumstances of each case."

In *Rust* v. *Conrad,* 47 Mich. 449, 454, it is said:

"When a party comes into equity it should be very plain that his claim is an equitable one. If the contract is unequal; * * * if he has obtained the assent of the other party to unreasonable provisions; if there are any indications of overreaching or unfairness on his part, the court will refuse to entertain his case, and turn him over to the usual remedies."

In *Van Norsdall* v. *Smith,* 141 Mich. 355, 362, it is said:

"Every unfair contract is in some measure unconscionable and hard. Courts withhold the peculiar relief asked for here, as well where the hardship appears from external facts, events, or circumstances as when it appears from the provisions of the contract itself, and leave complainants to their legal remedy."

In *Linsell* v. *Halicki,* 240 Mich. 483, the Michigan authorities cited above were reviewed and approved.

Plaintiff could not enforce specific performance of the contract. He could not compel defendant to manufacture end-grained wheels under his patent. He could not compel defendant to sell such wheels. He could not procure dividends upon his stock in case such dividends accrued, unless they equaled 6 per cent., nor could he compel delivery of the stock. When, from the nature of the contract, or other cause, it is incapable of being enforced against one party, that party is, generally, incapable of enforcing it against the other. *McMurtrie* v. *Bennette,* Har. Ch. 124; *Hawley* v. *Sheldon,* Har. Ch. 420; *Maynard* v. *Brown,* 41 Mich. 298; *Rust* v. *Conrad, supra; Reo Motor Car Co.* v. *Young, supra;* Fry on Specific Performance (5th Ed.), § 460; 36 Cyc. p. 621.

In *McMurtrie* v. *Bennette, supra,* it is said:

"The contract or agreement sought to be enforced, must be mutual, and the tie reciprocal, or a court of equity will not enforce a performance."

In *Hawley* v. *Sheldon, supra,* it is said:

"It is a general rule that a court of equity will not decree a specific performance where the remedy is not mutual, or one party only is bound by the agreement."

In 36 Cyc. p. 621, it is said:

"That as a requisite to specific performance there must be mutuality of obligation and of remedy has been made in innumerable cases and is accepted by the text-books as a cardinal principle."

The contract is one in which defendant reserved to itself the power and authority to render nugatory any decree that ought to be rendered for its enforcement. There is no obligation on defendant to either manufacture or sell wheels covered by plaintiff's patent. Defendant may evade the contract. In

effect, defendant reserved the power to revoke any obligation to manufacture and sell wheels covered by plaintiff's patent, even if such obligation was implied in the first instance.

In *Rust* v. *Conrad*, 47 Mich. 449, 455, it is said:

"All contracts where the party has reserved to himself, or where the law gives him the authority to render nugatory any decree that ought to be rendered in their enforcement, rest upon the same principle. This was recognized in *Marble Co.* v. *Ripley*, 10 Wall. (U. S.) 339, 359; and more distinctly asserted and decided in *Express Co.* v. *Railroad Co.*, 99 U. S. 191. In this last case the very strong assertion is made that 'a court of equity never interferes where the power of revocation exists.'"

This case has been criticized by Professor Ames, 1 Columbia Law Review, 1; and by the supreme court of Pennsylvania in *Philadelphia Ball Club* v. *Lajoie*, 202 Pa. 210 (51 Atl. 973, 58 L. R. A. 227, 90 Am. St. Rep. 627).

The rule there declared was changed by statute. Act No. 73, Pub. Acts 1883; Act No. 145, Pub. Acts 1883. These statutes have been given effect. *Grummett* v. *Gingrass*, 77 Mich. 369, but neither these criticisms nor the statutes change the rule above set forth.

The contract being one where it is doubtful if there was a meeting of the minds of the parties, which is ambiguous, unjust, unfair, and inequitable; one where there is a lack of mutuality of obligations and remedies; one in relation to which defendant reserved to itself the right to render it inoperative and nugatory, defendant is not entitled to its specific performance.

Plaintiff asks for rescission and cancellation of the contract. Rescission is often spoken of as the converse of specific performance, meaning that a party who could successfully resist a suit for specific performance will be entitled affirmatively to demand the rescission of the contract. In general, where a specific

execution would be refused, a rescission will be decreed. Black on Rescission and Cancellation, § 12; 9 C. J. p. 1196.    Where the circumstances of a particular case are such that the court would refuse to enforce the contract specifically at the suit of one of the contracting parties, it is within the discretion of the court to grant rescission at the suit of the other party. 9 C. J. p. 1196.

In *Kirby* v. *Harrison,* 2 Ohio St. 326 (59 Am. Dec. 677), it is said:

"It is undoubtedly within the sound discretion of the chancellor to refuse to rescind a contract, the specific execution of which he would not decree;    *    *    * But, in general, where a specific execution would be refused, a rescission will be decreed."

Unless the damages can be ascertained with reasonable certainty, rescission is a matter of right with restitution instead of compensation.    9 C. J. p. 1183. The court will not grant specific performance to defendant and at the same time leave plaintiff to a bare legal remedy for nonexistent damages.    Defendant, because its manager was a shrewd business man, learned in the law, should be allowed to retain no undue advantage over plaintiff because of his careless and confiding nature and his lack of business ability and shrewdness.

The decree is reversed, and one will be here entered rescinding and canceling the contract, with costs to appellant.

FEAD, C. J., and SHARPE, J., concurred.    NORTH, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred in the result.